Your Honor, the court case in the Doctrine is 2-17-0032. The people of the state of Illinois, Plainton, Appalachia, the invading Starks have been discovered. Are you going to have them discovered? Yes, Ms. Nevaeh. Are you going to have Plainton, Appalachia, Stephen A. Robbins? No. Ms. Nevaeh, is that correct? You may proceed when you're ready. Good afternoon, Your Honor. May it please the court. Again, my name is Yasmin Nevaeh, and I represent David Starks on behalf of the State Appellate Defender. Today I will focus on the reasonable doubt claim. But as the two claims help to explain why a jury faced with such weak evidence would enter a finding of guilt, I will touch upon the prosecutor's closing argument as well, because I'm happy to answer any questions you may have. The state's case, by the prosecutor's own admission during its rebuttal argument, was tethered together by two, Starks would argue, equally unveiling threats of evidence. The first being DNA evidence, which connected Mr. Starks to a hat found in the complainant's van 12 hours after the events. Importantly, however, the forensic expert could not provide any testimony on the temporal proximity of that DNA to the incident. In other words, that Starks' DNA was deposited on the hat at or near the time of the incident. Is that required? Your Honor, it is required. It's been required in fingerprint cases under P. B. Gomez and P. B. Rivera, Juan Luna, I'm sorry, P. B. Rivera. This case reaffirmed that when we have circumstantial evidence of the sort, like DNA or fingerprint evidence, the DNA evidence goes only so far as to prove identity. It does not establish that the identity of the offender. I think you, in isolation, you're probably correct. However, how does it end up being in the car that was carjacked shortly after the crime? Well, there are multiple explanations. I mean, he may have given this hat away. Importantly, and I'll start with Ms. Lawrence's testimony if I may, Ms. Lawrence testified that she tested around the perimeter of the brim of the Arizona Razorback hat and she identified a major. Arkansas. I'm sorry. There is an Arizona Razorback. I think this one's Arkansas. This one is Arkansas. You are absolutely right. Oh, Dan Hampton would be mad at you. Well, we'll just not talk about it. Okay, we won't talk. She discovered a major and minor profile. She testified that the major profile is simply the one DNA that's more prominent. The minor profile is the least deposited amount of DNA. Importantly, however, she said, the major and minor profile doesn't say anything about who wore the hat the longest, who wore the hat most recently. She could only say that there was DNA there, not how it got there. And in cases such as this, as I indicated, in people v. Oscar Gomez and people v. Rivera, we need something more than just the fact of the DNA or the fingerprint. But there is other evidence. The other evidence is, one, that it was found in the van that was parked at the location where the crime occurred. And there was testimony by the little boy that he was thrown out of the van and that two men drove off with the van. That same van was found back in the parking lot, and that's where the hat was. There was also video identification from in the store of the men, one of whom was wearing the hat. And other identification, although not dispositive identification, of the people who were in the store. So there is other evidence. And besides that, in Gomez, there was another explanation for how the evidence got to be in the location, which was that the person had been in the home to pay his rent at a different time. There is no other alternative explanation for finding this hat in the van. Your Honor, I think I just proffered one, but let me just speak to Peterson first. That is our other witness. And in fact, the identification in this, Mr. Starks would define as a non-identification. Aside from all of the circumstances surrounding that identification. And I actually have a copy of People's Exhibit 12, which I think is highly important in this case. This is the photo array which Mr. Peterson viewed. Mr. Peterson testified, first of all, the photographs, the surveillance camera, I viewed it myself. And all that's discernible in that is two men wearing hats. A darker hat, who the state theorized was the heavier set Hispanic man. And a white hat, turns out to be that they find a similar hat in the van of the car 12 hours later. Again, that's 12 hours later and we don't have temporal proximity. But nonetheless, let me return to Mr. Peterson. Looking at People's Exhibit 12, he identified number 4 as the Hispanic offender who was the heavier set man. And the person number 3 as the skinnier black man whom the state theorized was our client. Importantly, he wrote two maybes around that. But here's a significant factor. Detective Mayes testified that our client was not 3, but in fact, the person in position number 4. That's an important fact. So we have a maybe, and on top of that, we have a Hispanic man, which the state theorized was wearing the darker hat, not the white hat. That's a critical fact. And he only went so far as to describe this hat based on his viewing as some kind of logo on front of it with a red dot. Can we honestly say that was a non-identification or can we legitimately say it was a tentative identification or not a definitive identification? It wasn't a non-identification. I would say it's a non-identification. Not a weak identification, it's a non-identification. I would say it's a non-identification. And if you will, I'd like to go to the circumstances surrounding that as well. Because he says he initially saw the offender's faces for the profile for 10 to 20 seconds when he approached the hardware aisle from a distance of 20 feet. On cross-examination, he admitted, oh yeah, it was actually farther away. Then he testifies that, no, I got a frontal view of those people for like a split second. That wasn't in his report. Again, we have to extend a lot of inferences in his favor. Then he claimed he got as close as 10 feet from these people when they pushed Jarvion out of his mother's car and he saw their sides of their faces. Again, this is a loss or an asset protection person and he misidentifies two people. And then we have on top of that, what we know from our own Supreme Court and people of ILRMA, that eyewitness identifications are normally infallible. And there's so many reasons. If an asset protection guy, we have to be suspicious about those eyewitness identifications. In this case, he's identifying two people as maybes and on top of that is identifying our client as the wrong person. And then having to admit throughout his testimony that his perceptions were mistaken, that his report doesn't match up with his testimony. He says, for example, I got there two minutes and 18 seconds after leaving. He admits finally that I got to the floor at two minutes and 18 seconds after this incident. When he said, no, I got there within five seconds. And on top of that, the photo array is not videotaped. And on top of that, the Detective Mays cannot find his report. So even assuming the credibility of all of these people and who believe what they testify to, their memories are fallible. The report, they're not. I can't. I didn't hear them testify. The jury heard them testify. Correct. I can't say that they didn't, they were, there were inconsistencies. But I can't say that they weren't telling the truth. The jury alone can say they were telling the truth or they weren't telling the truth. Your Honor, I don't dispute that they didn't believe they were telling the truth or that they're credible. I'm just saying simply that their memories could be faded by the fact that we don't have a report indicating that he sees a full frontal view. And he says it's only a second that he does see it. But what we do have is his testimony. And he's misidentifying the number four, our client, as the heavier Hispanic man. And we have no in-court identification. That, Your Honors, is before you in this record. But there is other evidence that we've just, we've talked about a few minutes ago. Correct. And really what we have to look at when there's a challenge to sufficiency of the evidence is whether, viewing the evidence in a light favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond reasonable doubt. So you obviously are focusing on what you believe are the weakest parts of the evidence. But there was additional evidence that the jury considered. These were the two, by the prosecutor's own admission, the two threads of evidence on which they, no pun intended, hung their hat on. One being Peterson's identification. Because Jarvion identified two other people from the photo array that he viewed. And then the DNA evidence from Ms. Lawrence. And Ms. Lawrence said that she could not say how that DNA got there. There is an explanation. Have you ever known any expert who's testified in criminal cases that can tell you how the evidence got onto it? They're not witnesses to the crime. They could never tell you that. Would they? No, but there might be surrounding evidence which might, in a case where, this is in a case where we have such weak evidence, there might be other evidence which might explain why, or give us that missing link, that temporal proximity. And that's in State Argument's van, doesn't it? The hat in the van. Yeah. The hat in the van is found 12 hours later. Why? Well, the car is found 12 hours later. Well, so is the hat as well. The hat is found within the van. It would have been nice if they'd returned the car within 15 or 20 minutes, but we have to take the evidence as we find it and use it, correct? Absolutely. But the State does have the burden of proof. Well, this is pretty, I mean, I don't say sympathetic, but it's pretty significant that a young man who's just had his appendix taken out, who's 10 years old? 14. 14. Well, he's still young. I've been there. I understand. He's yanked out of a car waiting for his mother to bring his medicine out. I mean, this is rather significant. And while he can't specifically identify, and that's understood, the fact remains he's taken out of this car. This car is taken. I can imagine what his mother felt as she walked out the door. And miraculously, somebody must have felt sorry, and 10 hours later, the car, 12 hours later, the car returns. So it's rather remarkable. Your Honor, we deal with terrible crimes all the time. But it's also our burden in this, in our justice system, to hold the State to a high standard when a person's guilt or innocence, the presumption of innocence is quite important. Establishing someone guilty beyond a reasonable doubt is a high burden that the prosecutor takes. But what I'm saying is this young man's memory was before the court, was before the jury. They understood why he couldn't identify. That's not a problem. I understand that. But the fact is, he didn't identify someone. I cast no aspersions on him. I myself had appendectomy surgery. I was that person. You know, I understand. I have most sympathy. But again, we don't have the evidence here in this case. While it is a sympathetic crime, we don't have enough to say that, that any rational prior effect could find Mr. Starks guilty of this offense based on the prosecution's case. Did defense counsel, during the course of his arguments or the trial, challenge the asset manager? How can you be so uncertain when this is your job? Was that type of question ever asked? It was. He was subject to a very heavy cross-examination by defense counsel. The identification itself was subject to a pretrial motion in limine, because it was not videotaped as required by statute. So there were many challenges. His closing arguments focused on the fact that temporal proximity was not established, that the critical element of temporal proximity is not established. And that kind of brings me to, again, the prosecutor, over and over again, through the rebuttal argument and their closing arguments, described this DNA evidence as unequivocal DNA evidence, when in fact it was not the sort. And it led into the prosecutor's foul. We have a 100% match. There's a 100% chance it wasn't Mr. Starks. During that same part of the argument, they did specifically mention the conclusion that the results were 1 in 205 quintillion that this DNA profile would be expected to occur in that 1 in 205 quintillion random, unrelated African Americans. So he also, or the prosecutor also, concluded that, as well, the jury couldn't have, well, one, the trial court also admonished the jury that what the attorney said is not evidence, but rather just their argument. Isn't that correct? Correct. But in other cases, we have found error, even with that admonishment, particularly in weak cases, where the evidence is so weak and a closing argument, for example, will tip the balance in favor of, for example, one side or the other. In this case, yeah, I'd like to speak, I would be remiss if I didn't get into a little bit about the DNA evidence here. There was no testimony on direct examination about how many sites there was a match. She testified, Ms. Lawrence did, that there was a full profile from the hat and that it matched the alleles of Mr. Starks. Counsel, there was no cross-examination at the trial level of this witness, was there? I'm not sure if there was, but I know, no, I don't think that's correct. I think there was a cross-examination of Ms. Lawrence. Yes, there was. I'm actually certain of it. There was a cross-examination of Ms. Lawrence. Well, then that cross-examination, I assume, challenged the, well, did challenge the issue of alleles and things of that nature. Yes. And she testified that, in reference to the DNA that they didn't, the non-conclusive DNA that they found in the car, that we normally test at 21 spots, at 21 loci, but she didn't critically say how many that defendant matched, just that she couldn't, that the partial, the partial DNA that they recovered from the, if I believe, if I'm not mistaken, was the driver's door, driver's side, was partial. Doesn't that go to the weight of the evidence, as opposed to the admissibility? Oh, I'm not speaking to the admissibility. I'm just trying to give you a view of all of the evidence in the case that we're dealing with. You're absolutely right. Going back to your question about the DNA evidence, the prosecutors allegedly committed error by saying that this was a complete or 100% match. Are there 205 quintillion people on this planet? No. In fact, actually, People v. Harvey has spoken to that. Our courts have cautioned about these enormous numbers that we provide in giving DNA testimony. One in 205 quintillion, when there aren't even that many people, and perhaps, for example, in Elgin, there's much less, or within the state of Illinois. And the prosecutor's fallacy, if I could just talk about that briefly. It has to be briefly, because your time is up. No. Just briefly, it's the assumption that just because if there's a random chance of that occurring, that then that means that it could be anybody's DNA other than the defendant. That's the prosecutor's fallacy. So if there are no further questions, we just simply ask for an outright reversal. Thank you. You'll have time for response or rebuttal. Mr. Rogers. Good morning, Your Honors. Counsel, may it please the Court. My name is Steven Rogers, and I represent the people of the state of Illinois. Your Honors, on the sufficiency of the evidence, of course, we don't take each piece of evidence individually. Instead, we look at the evidence collectively. And the evidence in this case established that Tim Peterson, who was a Home Depot asset protection specialist, saw two suspicious men walking in, wearing heavy clothing, during July. He watched those individuals enter the hardware section and start to remove items from the shelf. At this point, he leaves his location, viewing the video, and enters the sales floor, where he watches these two men both conceal items on their person, and then exit the aisle. Peterson follows these men outside the store, where he announces his position as the asset protection specialist. The two men both look back, glance at him, where Peterson says he gets a head-on look. The two men begin jogging, and Peterson chases these two individuals until they enter the 2001 Ford Windstar van, which was right next to a Walgreens parking lot. Peterson watches these two men push Jarvin Winston out of the vehicle, and then drive off. The next morning, the car is located back at Home Depot. At that point, Belinda Watson, who's the owner of the hijacked van, and the mother of Jarvin Winston, is called to inspect the van, and to tell the officers if there's anything out of place. I think we're pretty much familiar with the facts. If you could hone in on some of her arguments. So, obviously, you're alluding to the fact that Peterson ostensibly got a look at the perpetrators. Yes, sir. She's saying, well, that may be true, but he somehow misidentified them in the photo array. How do you respond to that? He did ID the defendant. It was one month later, and he sees the defendant wearing a white hat, and then he IDs him in the photo array without a hat. Well, how do you respond to the fact that he identified the wrong person number three, and he wrote maybe under it? So, how is that an identification counsel? Well, Your Honor, on the first point, I just think he was mistaken in flip-flopping it. Because when you look at... Mistaken in what respect? Well, at position number four, he's saying that was the heavier set Hispanic man. And I think just looking at the picture, you would recognize that it's not a Hispanic individual. Well, are we... You're saying we should just assume that... I'm not sure what you're saying. Well, Your Honor, just by looking at the picture, I think it's pretty clear that he did switch them. Okay, and then what about the fact of writing maybe and no in-court identification? Yes, Your Honor. On the maybe, he said it wasn't because he was uncertain. He thought those were the two offenders, but that he wasn't 100% sure. And again, a month later, I don't know how many of us would be 100% sure of the individual we saw. So, how would you characterize this identification? Is it a strong identification? It was a tentative identification. He thought those were the two individuals. He wasn't certain. All right, so it was tentative. Tentative identification. I think that's a fair characterization. And then, I think, in support of his identification is the video and photo evidence, which is certainly not the clearest. But you can see the slimmer billed individual wearing the white hat with a red dot on the logo. And I think the defense counsel just said we can assume that the offender wore that hat, the white hat with the red logo. And that's an individual that would have fit the defendant's characteristics. Well, that's what she takes issue with. I mean, ostensibly, that's a strong, compelling piece of evidence. Okay? If we use the DNA evidence, the defendant was wearing that hat at some point, she's going to say. But she says, uh-huh. The evidence establishes he was wearing that hat at some point, but how do we know he was wearing it at the time of the crime and committed the crime? Well, that's where the video well, both the identification and then the video and photo array would show someone that fits the defendant's billed and characteristics wearing a white hat with a red logo. And that individual leaves the Home Depot and then enters the van. And then you have Belinda Watson saying, that's not my hat, that's no relative's hat. It was not in the van to begin with. So that hat, and I think defense counsel would concede, was left there by the offender in the case. And Kelly Lawrence said, well, she can't tell the temporal proximity when the DNA was left that it would likely be the person that deposited the most DNA. And this is, again, a July day where the defendant was wearing heavier clothing and jogging across the parking lot to the Walgreens. So, specifically then, I ask you the third question, what evidence puts the hat on the defendant at the time of the crime? That's what she seems to be telling the lectern on. Even if we assume it's his hat, how do we know he was wearing it at the time of the crime? Well, that would have been the identification by Peterson along with the video from Home Depot. Now, of course, and that's why it's all taken together, because had we seen on the video that this was a white male wearing the white hat with the red logo, we could say there's something amiss with the DNA evidence that he had to have grabbed someone else's hat on the way out the door that day, or someone that was much taller or much shorter. But the video essentially corroborates his identification, that someone with that build and... Well, how do you respond to the fact that it wasn't found until 12 hours later, though? How does that establish any temporal connection? Well, Your Honor, that would again go back to what I think the defense counsel conceded was that we could assume that the offender was wearing that white hat with the Razorbacks logo. So the offender that's portrayed on the video and that the witness testified was wearing a white hat with a red dot. Yes, Your Honor. And that hat is immediately deposited, because otherwise it would be the reasonable hypothesis of innocence that we would have to assume that that person was wearing the hat, didn't lose it, leaves, and then somehow the defendant's hat gets in the car in that intervening 12 hours and the jury is not required to accept that sort of speculation. All right. So the overarching essence of your argument is when reviewing the evidence, we don't look at these items in isolation and say, well, there's a problem with this, there's a problem with this, there's a problem with this. You'd have to consider it collectively in the totality of the evidence altogether. Yes, Your Honor. And I think each piece of evidence corroborates the other. There's not one piece of evidence that completely undermines another piece of evidence so that we could discard that piece of evidence. When this minivan was found the next day or 12 hours later, it was unlocked, correct? I'm not sure about locked, but the windows were down. The windows were down. So they were able to get into it, I suppose. Did anybody argue? Well, obviously, whoever the offender was threw it in as he walked by. Was that ever argued by defense or was that ever an issue? No, Your Honor. So... I think they did the same sort of argument that, well, the hat could have gotten in there whenever. We don't know. I mean, Jarvin Winston didn't testify that the hat was flipped off when he's getting pushed out of the car, but I certainly think it's at a minimum a reasonable inference to believe that the thieves and then the carjackers, one of those individuals was the one that deposited the white razorback's hat. Okay. I know we're not taking evidence individually, but what is, I mean, this issue that the state raises or argues, you know, we're using 1 in 205 quintillion. Why does the state do that? Your Honor, to be quite honest... Especially when they've been cautioned. Well, that's the forensic scientist's testimony, and I wonder what would be better if you just said it was a full match. That almost doesn't give the jury any indication because what the defense is saying is when you have three, say you only have three loki to test it, and you say it was a full match at three loki, but that might mean it's only one in every 600 people. I would think the defense would want that to be known, and actually in pipes, it was down to one in two people. It was a two loki match. I would imagine that would be something the defense would want known, and so in a case where it's a full match, Kelly Lawrence is saying we're testing at 21 locations and we have a full match. I mean, I think the state should be able to offer the strength of that testimony when certainly a defendant would want it to be known that it was a weaker match. Right. Somebody, inevitably, is going to ask, well, what do you mean by a full match? Is that your point? The question is going to be asked instead of just, like, hanging in the air. It would be vague, and you would say it's a full match at two loki. You'd say, hey, we have these two loki to test. It was a full match, but that tells us almost nothing. Well, why wasn't it an error for the federal that it was a 100% match? Your Honor, the 100% and 1,000%, I certainly think, probably constitute hyperbole. You know, anything is between 0 and 100%, and so very rarely are we 100% sure of anything. I would say that those two comments specifically were hyperbole, but it was strong evidence. But what the state did not do is I think what the McDaniel case is one of the only ones I found where they actually laid out and said that was the prosecutor's fallacy. That's how it occurs. And that was, in that case, they said 1 in 3 million people would be expected to match. So then the state argued that the likelihood that the DNA did not come from the defendant was .000033%. And then you go to, you flip that, and you say, so we can be 99.9999 4967% sure that he's guilty. And you can't do that. The state can argue the strength of the evidence than the reasonable inferences. And the state always placed this in context. The state really never said the DNA evidence alone proved him guilty, because again... Well, they did say this is the linchpin. The DNA evidence is the linchpin of this case. What does that mean? Well, the DNA evidence alone, and McDaniel specifically, McDaniel had multiple brothers, two of which I believe lived near him. And when you don't take that into account, those astronomical numbers are very misleading. If your honors have no further questions, the state respectfully requests that your honors affirm the defendant's conviction. Thank you. Ms. Snibai. I do want to answer your last question, Justice Hutchinson. The prosecutor did link it all up. He played right into the prosecutor's fallacy. He said, really there are two pieces of evidence. When you put those two pieces of evidence in, there is one inescapable conclusion. And then he goes into the two pieces of evidence, one being the DNA and Tim Peterson's identification. When you put these two together, it brings us to the inescapable conclusion that the defendant was one of the two offenders. He repeats this 100% match, 100% chance over and over again. In a case this week, we can see where the jury entered its finding of guilt. This is more than hyperbole, your honors. This is a misrepresentation based upon the actual evidence that they presented. Whoever did the rebuttal for the state didn't just say this cap has been this cap was found, it has this DNA, it's very similar to this DNA, therefore he's the defendant. He put the identification in as an additional part. The fallacy would just be saying DNA says he was there, therefore he's guilty. I think he went that far when he said 100% match, 100% it's unequivocal. But even if you're right, your honors, he overinflated the argument as well. In talking about Peterson's identification, he says he identified these two people not so fast. I come back to, just as enough, what you were saying. We have to give Peterson break after break after break after break in order to find his identification tentative even. It's a non-identification when you look at all the problems with his identification. If you look at the difference of two men, one is allegedly 200, one is 250, they're both tall. I don't know that we can say that and we have a, the state is admitting there's no temporal proximity here. There is no testimony about temporal proximity, game over. Does there have to be testimony about that? It can be circumstantial, can it not? There can be evidence, but there just isn't circumstantial evidence enough in this case and there isn't from our critical forensic scientists. When we have that, and I ask you to look at the evidence as a whole. Both, all pieces of evidence here. We're looking at a really non-identification, a razorback hat and I refer back to what Mr. Peterson testified to on the stand. He didn't identify a razorback hat. He said I saw a hat with red logo. That is different than a razorback hat. But even if we were to assume for the sake of argument that same hat that's found on that car is the hat that was worn by the offender, again, they don't have the critical link which you don't have the inescapable conclusion. And I urge your honors to look at Pike's. That is exactly what a prosecutor should argue. Not what the prosecutor argued here. In this case you'd have to be that was a case where the prosecutor was quite limited in his testimony. Not here. And finally there's no... The prosecutor didn't testify. I'm sorry. The prosecutor didn't argue. Okay. Sorry. There's no in-court ID because both witnesses didn't get a good look at the offender. The only reasonable inference is that the State did not prove Mr. Sars guilt beyond a reasonable doubt. For those reasons, for all that's advanced in our briefs, I ask that you reverse these convictions outright or remand for a new trial. Thank you. Thank you. All right. Counsel, thank you very much for your arguments. Counsel, thank you for your trip here. Construction was probably leaving you ahead. We will take the matter under advisement, issue a decision in due course.